products compete particularly well. In the case of another, Intel offers as an inducement discounted microprocessors rather than rebates. In the case of the European division of one U.S. OEM, Intel has imposed a target of between 70-90% of the customer's requirements. Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (*e.g.*, a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

71.    Upon information and belief, Intel makes similar offers to smaller OEMs but they are generally unwritten, and Intel leaves undefined the consequences of failing to meet a target. Thus, a customer falls short at its risk, knowing only that it may lose its account with Intel and have to source future products from Intel distributors, which is both more expensive and provides less security of supply than direct purchase.

72.    The key features of all of Intel's rebate schemes are that they are discriminatory and market-foreclosing. If the customer chooses to purchase any significant quantity of microprocessors from an Intel competitor, it will not qualify for its rebate, and its price will be higher on all the Intel processors it buys across the board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself – but to a greater harm to its competitors and ultimately consumers – as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

73.    Intel's use of retroactive rebates leads, in some cases, to below-cost pricing on incremental sales. The following example shows why a customer's incremental cost of purchasing from Intel those units that both Intel and, for example, AMD, could supply (the "contested sales") can be zero or even negative – a price AMD cannot match. Consider an OEM which has purchased 90 units of Microprocessor A at $100 per unit under an Intel rebate scheme that entitles it to a 10% first-dollar discount but only after it purchases more than 90 units. Its

CLASS ACTION COMPLAINT - 25

cost for the 90 processors is $9,000. The OEM is now considering an additional purchase of a further 10 units. If it makes the additional purchase from Intel, the OEM will meet the expenditure condition and will qualify for the 10% per unit discount on all units. Accordingly, the total spent will remain $9,000. The incremental cost of the 10 additional microprocessors – as well as Intel's incremental revenue – will be zero (the $1,000 additionally spent, less the $1,000 thereby saved). In other words, this scheme leads to incremental units being offered to the OEMs for nothing, leaving AMD hopelessly boxed out.

74.    Even if Intel were to earn some incremental revenue on these marginal units, these additional revenues could be below the incremental cost of their production. As a result, Intel's additional profit on the sale would be negative, but for the fact that it had a long-run exclusionary effect on AMD and other competitors. (Obviously, if Intel earns no revenues on its additional sales, it has to be foregoing profits.) As this analysis shows, some of Intel's discriminatory, retroactive rebates amount to unlawful, predatory below-cost pricing.

75.    Even where Intel's prices are above cost on the incremental volumes and overall despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the contested market segment while maintaining higher prices in its captive market. For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby "qualifying" for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

76.    The use of retroactive rebates to limit competitors to a small share of an OEM's business heightens the obstacle to inducing the OEM to launch platforms powered by Intel's competitors. OEMs incur substantial expense in designing and engineering a new computer, and

CLASS ACTION COMPLAINT - 26

make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of products powered by microprocessors made by competitors that an OEM can sell. Hence, Intel's practices exacerbate normal impediments to entry and expansion.

77.    Beyond exclusive dealing, product and channel restrictions and exclusionary rebates, Intel has resorted to threats and intimidation to deter OEMs from dealing with its competitors, including the use of the following: it can unilaterally reduce or withdraw a discount, rebate or subsidy; it can impose a discriminatory price increase on a disfavored customer, extend a price cut to that customer's competitor, or force retailers into dropping the customer's computers and buying from its competitor instead; or it can delay or dispute an allowance or rebate – all of which can turn a profitable quarter for an OEM into an unprofitable one. Other tactics include threatening to delay or curtail supplies of scarce processors or essential technical information.

78.    As Gateway executives have recounted, Intel's threats beat them into "guacamole." Gateway is not alone. Prior to its merger with HP, Compaq Computer received Intel threats every time it engaged with AMD. In late 2000, for example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed. Reporting that "he had a gun to his head," Capellas informed an AMD executive that he had to stop buying AMD processors.

79.    In 2002, Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

80.    Intel also uses weapons such as undermining the product launches of its competitors and product bundling as exclusionary tactics in a variety of ways. Intel's most

CLASS ACTION COMPLAINT - 27

common deployment is in bidding for a new OEM platform: it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.)  AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which incur their own costs and control their own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases. The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

81.    As retaliation for dealing with AMD, Intel has also used chipset pricing as a weapon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer executives worldwide had been working with AMD to bring the product to market post-launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if any processor business was awarded to AMD outside of Europe.

82.    Intel's dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

### 2.    Practices Directed At Distributors

83.    Intel uses many of the same tactics it practices on OEMs to restrict distributors from carrying microprocessors manufactured by its competitors or selling competitors' products

CLASS ACTION COMPLAINT - 28

into markets it deems strategic. For example, it entered into an exclusive deal with Synnex, which is one of the largest U.S. distributors. Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

84.    As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips as well. A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up.

85.    Intel also offers special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance such as credits to offset inventory costs.

86.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Like the rebates offered to OEMs, the intent is to inflict economic punishment on those who do too much business with AMD and other competitors. But, unlike OEMs, distributors remain ignorant of the goals Intel has set for them or the precise consequences of failing to meet them. Intel does not share this information with them; they simply receive a check at the end of a quarter.

87.    Finally, those distributors who choose to do business with AMD or others are subject to Intel responses. For example, when ASI, one of the largest computer hardware and software distributors, began distributing AMD processors, Intel demanded that it exclude AMD personnel from its ASI Technology Shows and its General Managers' meetings. Until recently, ASI refused master distributor status from AMD, despite the financial benefits attached, because it feared that such a public alignment with AMD would trigger Intel retaliation. When, in

CLASS ACTION COMPLAINT - 29

January 2005, it finally accepted Master Distributor status, Intel began reducing the level of market development funds ASI received.

88.    Upon information and belief, distributors that Intel has attempted to coerce from doing business with AMD include, R.I.C. in Germany, Paradigit in the Netherlands, Quote Components, in the Netherlands, Avnet, Inc. and Supercom.

89.    Intel's dealings with distributors are unlawfully exclusionary, have no procompetitive justification, and are intended to maintain its monopoly.

### 3.    Practices Directed At Retailers

90.    In both the U.S. and internationally, approximately one fifth of desktop and notebook computers is purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

91.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and retailers refresh their inventory for each. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. Shelf space is not free. The major retailers demand market development funds ("MDF") in exchange. MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff. The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how urgently the competing chipmakers want the shelf space.

92.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the

CLASS ACTION COMPLAINT - 30

ability to exert pressure to keep AMD out of their product plans. Also, it has significantly greater financial resources with which to buy retail shelf space.

93.    Intel has also made exclusive deals with many key retailers around the world. For example, until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk. Additionally, Fry's is Fujitsu's only retailer in the United States.  When Intel learned that Fry's was very successfully marketing a Fujitsu's Athlon™ XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

94.    Despite even harsher results in Europe, AMD has made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15% of their U.S. domestic market desktops with AMD processors; within notebook roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally outperformed Intel. For instance, in the desktop segment during the fourth quarter of 2004, AMD-equipped computers captured between a 33%-38% share of Circuit City's sales, despite being limited to five of the 25 models (20%) on the Circuit City shelves. And with approximately 15% of the shelf space allotted to its products at Best Buy and CompUSA, AMD computers accounted for roughly 30% and 22% of their sales, respectively.  These numbers confirm that AMD's products perform well at retail, provided that space is available.

95.    As a result, Intel instituted a rebate program similar to what it foisted on OEMs, with similar exclusionary effect.  Under this program, Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD-based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all products.

96.    At Circuit City, for example, if less than 20% of Circuit City's notebook revenue derives from AMD-based computers (30% for desktops), Intel has agreed to pay Circuit City $15

CLASS ACTION COMPLAINT - 31

in MDF per Intel-powered machine; but if the AMD percentage reaches or exceeds 20%, Circuit City's MDF subsidy is cut to $10. This creates a $5 per box "tax" on the retailer for doing 20% or more of its dollar volume with AMD-powered machines; and this "tax" is applicable to all of the Intel-powered machines that the retailer buys, back to the very first machine.

97.    The following illustrates the competitive disadvantage this creates for AMD: if Circuit City were to purchase only Intel-powered notebooks for its 200,000-unit inventory in a quarter, Intel would pay it $15 of MDF per computer, or a total of $3 million. However, if Circuit City were to reduce its purchases of Intel-based notebooks to 80% (160,000 units) so that it could stock a modest number of AMD-powered computers, Intel MDF would fall to $1.6 million ($10 MDF/unit times 160,000 units). Were AMD to match Intel's $10 per unit MDF on the 40,000 units it supplied, Circuit City would receive an additional $400,000, bringing its total MDF to $2 million, leaving it $1 million worse off for doing business with AMD. For AMD to make Circuit City "whole," it would have to vastly increase its MDF on its 20% share to $35 MDF per unit (40,000 x $35 = $1.4M), which together with Intel's $1.6 million would bring the total MDF back to $3 million. In other words, to just capture a 20% share, AMD must offer two or three times as much MDF as Intel – because it has far fewer units over which to spread the difference. Given these perverse economies, Circuit City is not likely to allocate less than 80% of its notebook sales to Intel, even if it means taking AMD stock off the shelves at the end of a quarter. (Indeed, to avoid inadvertently running afoul of the limitation, a prudent distributor would keep AMD's share well short of 20 %.)

98.    Intel's dealings with retailers are unlawfully exclusionary, have no procompetitive justification, and are intended to maintain its monopoly.

### 4.    Intel's Standard Setting and Other Technical Abuses

99.    Companies within the computer industry often agree to design certain aspects of their products in accordance with industry standards to ensure broad compatibility. Indeed, standards are essential in the computer industry. But when a company is unfairly excluded from

CLASS ACTION COMPLAINT - 32

the standards-setting process or is denied timely access to the standard, competition can be restrained in a way that reverberates throughout the entire market. Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market.

100.    By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

101.    The Joint Electron Device Engineering Council ("JEDEC") is the industry organization responsible for the standards governing the most recent generations of computer memory chips. Even though JEDEC was already developing the standards for the next generation of memory chips, Intel convened a secret committee that it dubbed the Advanced microprocessors Technology ("ADT") Consortium to develop a competing memory standard.

102.    The ADT Consortium was structured with multiple tiers of membership, each with different levels of access to information. The majority of companies were consigned to the lowest tier, meaning that they would receive access to the memory standard only upon its completion, but not during its development. The actual development effort was undertaken by companies with the highest tier membership status, which Intel reserved for itself and the major memory manufacturers. No other companies were allowed input or full access to the standard during its development by the ADT Consortium.

CLASS ACTION COMPLAINT - 33

103.    AMD needed access to the developing standard, and input into its definition, in order to be able to launch a microprocessor with updated memory controller technology at the same time as Intel. AMD lobbied repeatedly for higher tier membership status, but was continually turned down. Intel had structured the ADT Consortium's rules to require a unanimous vote – a rule that gave Intel veto power – over any decision to allow AMD to join the development committee; and it used that veto power to cause the Consortium arbitrarily to reject AMD's application.

104.    By foreclosing AMD from input or access to the memory standard during its development process, Intel placed AMD at a severe competitive disadvantage. As a consequence of its exclusion, AMD had no opportunity to monitor participants' suggestions and to object to Intel-proposed features that were without substantial benefit to consumers and were instead motivated by Intel's desire to disadvantage AMD's microprocessor architecture. Furthermore, by keeping the ADT Consortium memory standard-setting process shrouded in secrecy, Intel was able to gain a significant head start. While the ADT Consortium was ultimately unsuccessful in implementing an industry standard, this type of exclusionary conduct exemplifies Intel's attempts to use industry standard-setting to competitively disadvantage AMD in an unlawfully exclusionary manner.

105.    By this activity, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

106.    Even where it has been unable to exclude AMD and other competitors from participating in the development of industry standards, Intel has attempted to drive the adoption of standards having no substantial consumer benefit and whose sole or dominant purpose was to competitively disadvantage competitors based on its highly integrated microprocessor architecture.

CLASS ACTION COMPLAINT - 34

107.    In 2004, for example, JEDEC began developing standards governing the design of the memory modules for next generation ("DDR3") memory devices. These modules, known as dual inline memory modules, or "DIMMs," consisted of printed circuit boards upon which a number of memory chips were mounted. The DIMMs connected the memory chips to the computer's motherboard through a series of metal connectors known as "pins." One purpose of the JEDEC standards was to define the functions of these pins so as to enable chipmakers to design compatible memory controllers that would allow their microprocessors and the memory on the DIMMs to communicate.

108.    The JEDEC committee, which consists of members representing companies throughout the computer industry, had already adopted a scheme for defining the pins for the previous generation ("DDR2") DIMMs used in desktop and laptop computers. When the JEDEC committee began work on standards for DDR3 memory modules for desktop computers, Intel proposed that the committee adopt a pin definition similar to that used for the DDR2 memory modules. This proposal made perfect sense, as Intel explained to the committee, because it allowed DDR3 memory controllers to be compatible with DDR2 and DDR3 memory modules.

109.    However, when the JEDEC committee began to define the pins for DDR3 laptop memory modules in this consistent manner, Intel completely reversed its position, counterproposing instead that the committee rearrange the pin definitions. Intel's proposal had no discernable technical merit or basis.

110.    In fact, Intel's motivation for proposing modification of the laptop memory module pin definition was to competitively disadvantage AMD. Any modification to the laptop memory module pin definition would require Intel and AMD to make corresponding modifications of their memory controllers. AMD's microprocessor design, while representing a huge breakthrough in integration, embeds the memory controller directly into its microprocessor. While this produces significant computing advantages, modification of an embedded memory controller requires significantly more time and expense.

CLASS ACTION COMPLAINT - 35

111.    Knowing this vulnerability, Intel proposed its modified DDR3 memory module pin definition for laptop computers for the purpose of delaying AMD's introduction of a technologically superior part. While Intel's proposal was ultimately rejected by the JEDEC committee, confirming the proposal's complete lack of technical merit, this is yet another example of how Intel has attempted to drive industry standards to achieve its exclusionary ends.

112.    Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

113.    An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high- level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code – a machine-readable language – by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of different operating systems and programming languages.

114.    Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include, for example, mathematical modeling, multimedia, and video game applications.

115.    Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Some paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it

CLASS ACTION COMPLAINT - 36

executes a fully optimized code path and operates with the maximum efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash.

116.    ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations. Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but Intel's actions.

## VIII.    ANTICOMPETITIVE EFFECTS

117.    The above anticompetitive conduct has caused and will continue to cause substantial harm to competition in the market for x86 Microprocessor Chips in domestic, import, and export trade. Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice.

118.    Intel's anticompetitive acts both inside and outside the United States have a direct, substantial, and reasonably foreseeable effect on trade and commerce with foreign nations, and on United States import trade and commerce. In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel must necessarily exclude them from the product market world wide. As the domestic U.S. market is but an integral part of the world market, successful monopolization of the U.S. market is dependent on world market exclusion.

CLASS ACTION COMPLAINT - 37

119.    Intel's anti-competitive conduct, which violates the Sherman Act throughout the world, as well as state antitrust and unfair competition laws, has caused and will continue to cause substantial harm to consumers –including Plaintiffs and the other members of the Class, in the form of higher costs for microprocessors and Intel chips and for the products that contain them, such as personal computers.

120.    Any applicable statutes of limitations have been equitably tolled by Defendant's affirmative acts of fraudulent concealment, suppression, and denial of the true facts regarding the existence of the monopolistic and anti-competitive practices at issue herein. Such acts of fraudulent concealment included intentionally covering up and refusing to publicly disclose Defendant's conduct. Through such acts of fraudulent concealment, Intel could actively conceal its wrongful conduct from the public for years. Thus, all applicable statute of limitations should be tolled.

## IX.        CLAIMS FOR RELIEF

### First Claim for Relief

### (Violation of Section 2 of the Sherman Act)

121.    Plaintiffs incorporate and reallege, as though fully set for the herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

122.    As described above, Defendant possesses monopoly power in the relevant market for x86 Microprocessor Chips, and unlawfully and willfully maintained that monopoly power in interstate commerce in the relevant market by means of the unlawful exclusionary and price fixing agreements and activities detailed herein. This course of conduct included, *inter alia,*: (a) forcing major customers into exclusive or near-exclusive deals; (b) use of rebates, allowances, and market development funding in a manner so as to deny customers the ability to purchase

CLASS ACTION COMPLAINT - 38

from Intel's competitors; (c) threatening retaliation against customers; (d) establishing and enforcing quotas among retailers effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, and thereby limiting consumer choice; (e) forcing PC makers and technology partners to boycott Intel's competitors' product launches and promotions; and (f) forcing the industry technical standards and products in a manner which is designed to harm its competitors in the marketplace.

123.    The result of Defendant's unlawful conduct has been to obtain, sustain and extend its monopoly in the relevant market for x86 Microprocessor Chips, not through great skill, foresight and industry, but rather by the foregoing anti-competitive behavior described herein.

124.    Defendant intentionally and wrongfully acquired, created and maintained monopoly power in the x86 Microprocessor Market, and its anti-competitive conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

125.    Defendant's anti-competitive behavior injured Plaintiffs and the other members of the Class in their business or property by being deprived of the ability to purchase less expensive Microprocessor Chips than they would have paid in the absence of the antitrust violations and denying Plaintiffs and Class members a competitive choice of products in said market. The injury to Plaintiffs and the Class flows from Defendant's unlawful conduct and is the type of injury antitrust laws were designed to prevent.

126.    Plaintiffs and the Class seek a declaratory judgment that Defendant's conduct in seeking to prevent competition through its coercion of customers violates Section 2 of the Sherman Act and equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anti-competitive market effects caused by the unlawful conduct of Defendant, and other relief so as to assure that similar anti-competitive conduct does not occur in the future.

### Second Claim for Relief

CLASS ACTION COMPLAINT - 39

**(Violations of State Antitrust and Unfair Competition Laws)**

127.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

128.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Alabama Code §§ 8-10-1 *et seq,* and § 6-5-60 *et seq.*

129.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Arizona Revised Stat. Code §§ 44-1401 *et seq.* and §§ 44-1522 *et seq.*

130.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of California Bus. & Prof. Code §§ 16700 *et seq.* and § 16750, and Cal. Bus. & Prof. Code §§ 17200 *et seq.*

131.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of District of Columbia Code Ann. §§ 28-4503 *et seq.*

132.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Iowa Code §§ 553.1 *et seq.*

133.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Kansas Stat. Ann. §§ 50-101 *et seq,* and § 50-161(b).

134.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Maine Rev. Stat. Ann. 10, §§ 1101 *et seq.*

135.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Michigan Comp. Laws. Ann. §§ 445.773 *et seq.*

136.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Minnesota Stat. §§ 325D.52 *et seq.*

CLASS ACTION COMPLAINT - 40

137.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Mississippi Code Ann. § 75.21.1 *et seq.*

138.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Nebraska Rev. Stat. §§ 59-801 *et seq.* and § 59-1603 *et seq.*

139.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*

140.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

141.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.*

142.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

143.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Ohio Rev. Code Ann. §§ 1331.01 *et seq.*, § 1345.02(A), and § 1345.03.

144.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of South Dakota Codified Laws Ann. §§ 37-1-33 *et seq.*

145.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* and Tennessee common law.

146.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.*

147.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of West Virginia §§ 47-18-1 *et seq.*

CLASS ACTION COMPLAINT - 41

148.    By reason of the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Wisconsin Stat. §§ 133.01 *et seq.*

149.    By reason the foregoing, Defendant has monopolized the market and engaged in other anti-competitive conduct in violation of Florida law.

150.    By reason of the foregoing, Defendant has monopolized the market and engaged in other violations of N.J. Stat. Ann. § 56:8-1, *et seq.*

151.    By reason of the violations of the antitrust and unfair and deceptive trade practices acts, Plaintiffs and Class Members in each of the states listed above purchased x86 Microprocessor Chips or products containing the chips indirectly from Intel, and paid supra-competitive, artificially inflated prices for the microprocessors. As a direct and proximate result of Defendant's unlawful conduct, such members of the Class have been injured in their business and property in that they paid more for microprocessors than they otherwise would have paid in the absence of Defendant's unlawful conduct.

### Third Claim for Relief

### (Unjust Enrichment and Disgorgement of Profits)

152.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

153.    Defendant has been unjustly enriched through overpayments by Plaintiffs and Class members for x86 Microprocessor Chips or products containing those chips, and the resulting profits.

153.    Defendant has knowingly accepted this benefit, which has resulted and continues to result in an inequity to Plaintiffs and Class members. Defendant's acceptance of this benefit is not equitable and Defendant may thus not maintain this benefit.

154.    Under common law principles of unjust enrichment, Defendant should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and Class members.

CLASS ACTION COMPLAINT - 42

155.    Plaintiffs seek disgorgement of all profits resulting from such unjust enrichment, in the form of overpayments, and establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

A.    That the Court determine that the Sherman Act, state antitrust law, and state consumer protection and/or unfair competition law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure and Plaintiffs certified as class representatives;

B.    That the unlawful conduct alleged herein be adjudged and decreed to be:

 a.    An unlawful restraint of trade or commerce in violation of Section 2 of the Sherman Act, as alleged in the First Claim for Relief;

 b.    An unlawful restraint of trade or commerce in violation of the state antitrust laws and state consumer protection and unfair competition laws identified in the Second Claim for Relief herein; and

 c.    Acts of unjust enrichment as set forth in the Third Claim for Relief herein.

C.    That Plaintiffs and the Class recover all available damages, as provided by state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendant in an amount to be trebled in accordance with such laws;

D.    That Defendant, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing the illegal activities alleged herein;

E.    That Plaintiffs be awarded restitution, including disgorgement of profits obtained by Defendant as a result of its acts of unfair competition and acts of unjust enrichment.

CLASS ACTION COMPLAINT - 43

F.    That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

G.    That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

H.    That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## IX.    DEMAND FOR TRIAL BY JURY

156.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury of all issues so triable under the law.


DATED: July __, 2005.                    ROSENTHAL, MONHAIT, GROSS
                                         & GODDESS, P.A.


By:    _____
       JEFFREY S. GODDESS (Del. Bar No. 630)
       Suite 1401, 919 Market Street
       P.O. Box 1070
       Wilmington, DE  19899
       jgoddess@rmgglaw.com
       Telephone:  (302) 656-4433
       Facsimile: (302) 658-7567

       NATALIE FINKELMAN BENNETT
       SHEPHERD, FINKELMAN, MILLER
       & SHAH, LLC
       Media, PA  19063
       Telephone:  (610) 891-9880
       Facsimile:  (610) 891-9883

       JAMES E. MILLER
       SHEPHERD, FINKELMAN, MILLER
       & SHAH, LLC
       65 Main Street
       Chester, CT  06412-1311
       Telephone:  (860) 526 -1100
       Facsimile:  (860) 526-1120

CLASS ACTION COMPLAINT - 44

IRA NEIL RICHARDS
R. ANDREW SANTILLO
TRUJILLO RODRIGUEZ & RICHARDS, LLC
226 W. Rittenhouse Square, The Penthouse
Philadelphia, PA 19103
Telephone: (215) 731-9004
Facsimile: (215) 731-9044

DOUGLAS P. DEHLER
THE DEHLER LAW FIRM, S.C.
250 N. Sunnyslope Road, Suite 300
Brookfield, WI 53005
Telephone: (262) 780-7041
Facsimile: (262) 780-7057

MARC A. WITES
WITES & KAPETAN, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: (954) 570-8989
Facsimile: (954) 354-0205

JOHN R. MINNINO
J MINNINO, LLC
475 White Horse Pike
Collingswood, NJ 08107-2909
Telephone: (856) 833-0600
Facsimile: (856) 833-9649

**Attorneys for Plaintiffs**

CLASS ACTION COMPLAINT - 45